CLARENCE COOPER A.K.A. Ronnie Purcell A.K.A.
Ronnie Cooper *v.* STATE OF MARYLAND

[No. 233, September Term, 1978.]

*Decided February 8, 1979.*

The cause was argued before GILBERT, C. J., and MOYLAN
and LOWE, JJ.

*Howard Margulies, Assigned Public Defender,* for
appellant.

*Valerie A. Leonhart, Assistant Attorney General,* with
whom were *Francis Bill Burch, Attorney General, William A.
Swisher, State's Attorney for Baltimore City,* and *John S.
Denholm, Assistant State's Attorney for Baltimore City,* on
the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

On March 28, 1977, a jury of the Criminal Court of Baltimore found appellant, Clarence Cooper,[1] guilty of unlawfully conspiring to violate the controlled dangerous substances laws of Maryland with respect to the possession with intent to distribute heroin. On April 26, 1977, he was sentenced to 20 years imprisonment. He has raised two arguments here.

First, he contends that the trial court erred in denying his pretrial motion to suppress evidence seized in a search of his apartment because the affidavit supporting the warrant did not provide probable cause. Second, appellant argues under the Best Evidence Rule that the court erred in admitting into evidence a photocopy of a notebook page. We find both issues without merit and will affirm.

## probable cause

In *Henson v. State,* 236 Md. 518, 521 (1964), the Court of Appeals stated:

"Probable cause, which is less than certainty or demonstration but more than suspicion or possibility, is to be determined by the judge or justice who issues the warrant, and if a prudent and cautious man would be justified from the facts presented to show its existence in believing that the offense had been or was being committed, the warrant properly may be issued."

In the present case, the application for a warrant to search 11 Greenbury Court (appellant's car, residence and persons found therein) was supported by a primary affidavit of a Maryland State Trooper qualified as an expert in the Narcotic Division. The affidavit incorporated by reference three prior affidavits which had been submitted in support of an electronic surveillance and two wiretap applications in the

1. Appellant was known as Clarence Glen Cooper a.k.a. Ronnie Cooper a.k.a. Ronnie Purcell.

investigation of the same drug operation.[2] The orders granting those three petitions were also incorporated into the primary affidavit.

Our independent review of all four affidavits reveals that the investigating officers involved in the wiretaps and electronic surveillance were also experts in the narcotic field. The informants used were qualified in the affidavits as reliable sources of information. Each informant had a prior "track" record of accuracy and dependability.

The information presented by the four affidavits, from which probable cause had to be drawn, shows that the head of the "Cooper" drug operation was William A. Cooper. Reliable sources noted that, as head of the network, he had at times directly distributed drugs from his home. On October 22, 1975, William A. Cooper suffered a broken neck and back in a car accident which confined him to the hospital. He continued to deal from his hospital room, and endeavored to retain the reins of power within the organization. On December 19, 1975, the investigating officers were told "WILLIAM A. COOPER had a partner in his business known as RONNIE PURCELL aka RONNIE COOPER." Ronnie Cooper (appellant) told a police informant that "he handles all of the heroin on the east side of the city from WILLIAM A. COOPER and that COOPER was still running the operation from his hospital room . . . and that BOOTSIE (ANNA MAE JONES) [William A. Cooper's mother] was doing most of the running since WILLIAM was laid up."

On February 17, 1976, the two detectives on the investigation asked for the first wiretap order. Their affidavit stated that the Cooper operation was undergoing a change of command. Before William A. Cooper's accident, the heroin was disbursed only by the command of William A. Cooper. The detectives stated that William A. Cooper was "losing control of his organization to his mother, ANNA MAE JONES aka "BOOTSIE" and RONNIE COOPER aka RONNIE PURCELL aka CLARENCE GLEN COOPER."

---

2. Poore v. State, 39 Md. App. 44 (1978), another appeal (among many) arising out of the raid of the Cooper drug operation, discusses the State's investigative use of electronic surveillance and wiretaps.

The affidavit supports this statement with conversations recorded (during the electronic surveillance) between William A. Cooper and different members of the organization. Information from an informant also revealed that Ronnie Cooper had called a meeting of the entire family involved in the operation, and that they had decided to cut William A. Cooper out of the business. Appellant told the informant that any future problems or needs would have to go through him or through Anna Mae Jones.

The supporting affidavit before the Circuit Court for Baltimore County for a second wiretap order, made by the investigating Maryland State Trooper, stated: "RONNIE PURCELL alias RONNIE COOPER alias CLARENCE GLEN COOPER resides with his paramour, DENISE THORNTON — at Greenbury Court, Woodlawn, Baltimore County, Maryland." It also stated "that since the raid (March 9, 1976) on her [Anna Mae Jones] apartment, RONNIE (PURCELL) and DENISE (THORNTON) have been keeping a close watch on the parking lot from the back of their apartment," but that she (Anna Mae Jones) is "still conducting her routine business of trafficking Controlled Dangerous Substances."

The primary supporting affidavit of the application for the search warrant details the circumstances leading up to that request. A delivery of heroin from New York was made on May 5, 1976, by a known courier for the operation from New York to Baltimore. The affiant and another State trooper observed appellant driving the courier and another passenger to the address of Anna Mae Jones. All three exited the vehicle and went to the car trunk. Appellant removed a plastic hanging clothes bag and a brown paper grocery bag which he handed to the courier. The courier then entered the Jones' residence. Appellant and the other passenger drove directly to 11 Greenbury Court and parked the car. The officers observed appellant "exit the driver seat and open the trunk while looking around in a suspicious manner." Appellant "took a small brown bag from the trunk and close[d] same." He and the male passenger then entered appellant's residence.

Judge H. Kemp MacDaniel (now of this Court) reviewed the foregoing facts in the application for the search and seizure warrant. He found that probable cause did exist to believe that the laws relating to the illegal manufacturing, distribution and possession with intent to distribute controlled dangerous substances, were being violated at the address in question. Md. Ann. Code art. 27, §§ 286-287 (1976 Repl. Vol.) (§ 286 amended 1978 Supp.).

At appellant's pretrial suppression hearing, Judge Mary Arabian similarly concluded that Judge MacDaniel had adequate facts before him to determine that more than a mere "suspicion" existed that drugs or paraphernalia were at 11 Greenbury Court. We agree.

A drug pick up had just been completed, one stop was made at Anna Mae Jones' before appellant proceeded to 11 Greenbury Court. Parcels were removed from the car at both points. The officers assigned to the case had watched the drug ring over a period of months. They knew the "routine" manner of operation had been in flux during the power shift to Anna Mae Jones and appellant. As appellant conceded at oral argument, since Anna Mae Jones' home had been raided on March 9, 1976, and she was conscious of being watched, it was less likely that she would store the drugs at her residence.

While the appellant does not think that point added support to the probable cause issue, we disagree. It is another fact that could be weighed in determining that more than a mere suspicion existed that appellant might have controlled dangerous substances or paraphernalia in violation of sections 286 and 287 of article 27. The drugs had been brought from New York; they had to be at either one or both of the locations where stops were made. That there are two possibilities does not so divide the probability of either that one or the other would be exempted from the reach of a search warrant. See Andresen v. State, 24 Md. App. 128, 173-174 (1975), aff'd on other grounds, 427 U. S. 463 (1976).

Notwithstanding his concession that it was less likely that the drugs would be stored at Anna Mae Jones', appellant asserted that probable cause to search appellant's premises

at 11 Greenbury Court was still lacking because none of the affidavits indicated that appellant was himself an addict. He argued that only if appellant was an addict would he be likely to keep heroin in his apartment or retain a portion of the drug from the recent pick up, because a high echelon drug pusher would presumably be too eminent to retain possession.

That argument is an obvious non sequitur. We refuse to hold as a matter of law that the more important a criminal the less probable that there will be evidence of crime upon his premises. Even "big crooks" make dumb mistakes. It is the evidence and observations that give rise to the probabilities, not the assumed intelligence of the accused or the magnitude of his complicity. Taking into consideration the value of small quantities of narcotics, it is not inconceivable that a distributor at the top of the pecking order might well be hard pressed to trust his equally dishonest underlings with high priced granular contraband from which small quantities could be "skimmed."

Furthermore, as we already discussed, circumstances existed other than personal addiction or organizational stature, from which the judge could have inferred that appellant stored drugs or paraphernalia on his premises. The affiants of the four relevant affidavits were officers trained in the narcotics field. They had conducted a careful investigation over a period of several months. Given their lengthy observation of how the drug ring operated, the officers felt that the recent pick up, in which appellant participated, made it probable that controlled substances or paraphernalia were at 11 Greenbury Court. The Court of Appeals has frequently stated that the judge or justice who issues the warrant may, in making his determination, "give consideration to the special significance which objects, happenings and individuals may have conveyed to the trained, experienced and knowledgeable police officers who apply for the warrant." *Henson v. State,* 236 Md. at 521. Judge MacDaniel was justified in giving "consideration to the special significance" of the officers' experience, and in finding probable cause to issue the search warrant. Accordingly, we affirm the trial court's denial of appellant's

pretrial motion to suppress the evidence seized pursuant to the search of 11 Greenbury Court.

### best evidence or original documents rule

Appellant contends that the trial court erred in admitting into evidence the photocopy of a notebook page rather than the original page. The Best Evidence Rule states a *preference* for original documents, but does not foreclose use of secondary evidence "after a proper foundation has been laid, showing good and sufficient reasons for the failure to produce the primary evidence." *Forrester v. State,* 224 Md. 337, 349 (1961). The issue usually arises when the original document has been lost or destroyed. *See Sewell v. State,* 34 Md. App. 691, 694 (1977), *cert. denied,* 280 Md. 734 (1977).

We have not found a Maryland case dealing with the precise question now before us. *But see Green v. State,* 25 Md. App. 679, 687-689 (1975), *cert. denied,* 275 Md. 749 (1975). The original document here was neither lost nor destroyed; it had already been admitted into evidence in another trial. The document was part of the record in that case and would have to have been removed from another court file to be produced at appellant's trial. In order to avoid a potential problem on an appeal of the first case, due to an omission in the record, the State decided to photocopy the original page for use in appellant's case.

At trial the State presented this information to the judge to establish a foundation for admitting the secondary evidence. The judge ruled that the State's reasons were sufficient to excuse production of the original. She did not abuse her discretion in so ruling.

While appellant complained that he was not able to inspect the original document at the time of introduction, he did not attack the copy as differing from the original. The only prejudice to which he could point was that expected in any trial, *i.e.,* that the evidence contained criminatory matter. He could discern no improper prejudice, but because it was persuasive of guilt, had its admission been in error, the error

certainly was not harmless. Regrettably for appellant, it was not error.

At oral argument when asked how appellant was "prejudiced," or how introduction of the original would have benefited appellant, his counsel admitted that he did not know. He posited the possibility that erasures might show up on the original and not on the copy, but admitted there was no evidence even of that. Appellant did not allege that the State had any ulterior purpose in seeking to introduce the copy rather than the original, *see Anderson v. State,* 9 Md. App. 532, 539 (1970), *cert. denied,* 259 Md. 729 (1970), or that they had wanted a copy used for any reason other than to avoid judicial inconvenience.

The historic purpose [3] behind the original writing rule has diminished with the technologically accurate reproductions provided by carbon paper and photographic reproduction equipment. Both legibility and reliability are substantially assured by the new processes. *McCormick's Law of Evidence* § 236 (2d ed., E. Cleary ed. 1972). Copying by various photographic and other processes has become commonplace in today's business world; so much so that a uniform act has been adopted in Maryland and 37 other states, whereunder regularly kept photographic copies of business and public records are admissible without accounting for the original. *See* Md. Cts. & Jud. Proc. Code Ann. § 10-102 (1974). This contemporary common sense approach has been incorporated into the Federal Business Records Act, 28 U.S.C.A. § 1732 (b), and into the Federal Rules of Evidence wherein photographic or chemical copies are admitted as originals unless a genuine question is raised as to authenticity, or it appears it would be

---

3. "The treatment of copies under the rule requiring the production of the original document can only properly be understood when viewed in light of the technological history of copying itself. In its earliest stages, the rule appears to have developed against a background of copying performed by individuals of the Bob Cratchit sort, transcribing manually not always under the best of conditions. Errors under such circumstances were routinely to be expected. Only marginally greater reliability was to be found in the so-called letter-press. Here the original was written or typed in copying ink or with copying pencil. Presumably influenced by the infirmities present in such modes of copying, the courts generally declined to accept subsequently created copies as equivalent to originals." *McCormick's Law of Evidence* § 236 (2d ed., E. Cleary ed. 1972).

otherwise unfair to admit the duplicate. Fed. R. Evid. 1001 (4), 1003. While we still hold, in the absence of a similar rule, that wherever practicable the original document should be used, the rigidity of the original writing rule should be relaxed when, as here, the original is necessary for another equally important judicial purpose (*i.e.,* appellate review in another case), but is available for comparison if improprieties are suspected.

The trial judge in this case obviously balanced the potential for improper prejudice against the judicial inconvenience and the chance of loss of the original in passing it back and forth between records of cases pending in different courts. *Cf. Green v. State, supra* (typewritten statement of original tape recording). On the facts presented in this case we do not find that the trial judge abused her discretion in determining that a proper foundation had been laid for the admittance of the secondary evidence.

> *Judgment affirmed.*
> *Costs to be paid by the appellant.*